This is our first case this morning, 4-14-0835. Nicole Sochotsky, did I say that right? Sochotsky. Sochotsky. Sochotsky v. Pate. And on behalf of the appellant is Attorney Elizabeth Grant, and on behalf of the appellee is Attorney Angela Skinner. Mr. Grant, are you ready to begin? Yes, Your Honor. Thank you, Justice Polk. Good morning, Justice Steigman, Justice Polk, Justice Appleton. May it please the court and counsel. Your Honor, I'm going to refer to Ms. Sochotsky as Nicole because I had a difficulty with that name throughout the trial also. I believe that Nicole did not meet her burden to establish that removal of Key into the state of Florida was in his best interest. There was no significant financial improvement in Nicole's move to Florida, nor was there any significant improvement in her quality of life in other manners. I believe the evidence demonstrated her motives were suspect. The move severely impacted Mr. Pate's visitation time with Keyen, three-and-a-half-year-old Keyen, and the visitation schedule put in place by Judge Fitton was not reasonable. With regard to the quality of life, Your Honors, I note that Judge Fitton himself indicated in making his ruling, he wasn't making it with reluctance but with concern that the quality of life would improve, would improve, not significantly improve, would improve by the move to Florida. Later on in his ruling, however, Your Honors, he also refers to the factors in Bloomington being outweighed by the factors in Florida when he was making his consideration. And then at another time, he's referring to the Danville, relying upon the Danville schools versus the Bloomington schools. Judges, with all due respect to Judge Fitton, I believe his ruling was arbitrary in some fashions and was against the manifest way of the evidence in other fashions. For example, in speaking about the financial improvement in the move to Florida, Judge Fitton relied on the fact that Nicole's new husband, Mr. Hansen, had actually moved to an M3 position at State Farm. That position, Your Honors, would have given him earnings of between $80,000 and $100,000. However, the evidence was that Mr. Hansen was only earning $43,000, approximately $880. Judges, I ask you to look, as I ask the trial court to look, at Respondents Exhibit 14, which was Nicole's financial affairs affidavit. And in my closing of trial, Your Honors, I took Judge Fitton through that affidavit. And the fact of the matter is, the move to Florida, when you consider Mr. Hansen's earnings, they don't have the money to afford the expenses that show on that financial affairs affidavit, in addition to the other expenses, which I took Mr. Hansen through, another $1,145 in expenses. If you look to his earnings, they're short by over $1,100 monthly. That cannot be viewed as a significant improvement in the family's financial circumstances. Even if we look to Ms. Nicole working when she gets to Florida, which, Your Honors, I believe it was her burden, of course, to establish at trial what her plans actually were with regard to work. And at best, we have her working only part-time. But we don't even have that established clearly, Your Honors, because her own counsel asked her, if at some point you go back to work, et cetera. Nicole testified they could live without her working and rely upon Hansen's earnings. And that's just not the fact of the matter, Your Honors. The evidence establishes otherwise. With regard to other factors in looking to whether the quality of life would be improved, I really want to focus on cultural activities and the socialization of this three-and-a-half-year-old boy. In Bloomington, he had 29 family members every weekend. Every weekend, Mr. Pate had parenting time, which was four days out of every 14. Three-and-a-half-year-old Kian was able to visit with his paternal grandparents, with his maternal grandparents on a regular basis also, with Mr. Pate's siblings, with cousins, aunts and uncles. And he now is going to be restricted from having all of this contact with family who were very active in his life, who had activities planned every weekend, who met together every holiday. That's a grave denial of Kian's ability to continue to socialize as he had. Each and every witness at trial, Your Honors, conceded that Kian had become the great child that he was at that time because of the socialization he had through all of these family members. Counsel, Nicole and Jonathan were not married, were they? They were not, Your Honor. Section 609A of the Omaha Marriage and Constitutional Marriage Act discusses the circumstances under which a group from Oklahoma had been appropriated. By definition, it's in the Marriage Act. Does that section apply to a case like this? Judge, I believe this Court surely considers how active Mr. Pate was, whether they were married or not. You misunderstand my question, Your Honor. Does that section of the Marriage Act concerning the removal of children from the state apply to a child who's in the custody of a parent, but parents who are not married? Your Honor, I can't answer whether this Court has made that ruling or not. I certainly believe that it should apply. I would think so, but I'm just wondering, hasn't some Court in some ways said so? Judge, I'm unable to quote a case to this Court at this moment. Okay. I do believe the activity and the participation levels of Mr. Pate, of course, is very important to this Court as it would have been to the trial court. Mr. Pate couldn't have been more active in his child's life. There was extensive testimony about his activities with the child, his participation at medical appointments, his request to have 50-50 parenting time. He was as active as he possibly could be in this child's life. And as this Court has said and as the Supreme Court has said in Eckerd, when a parent diligently exercises their parenting, the Court should be reluctant to interfere in that parenting time. Now, what Mr. Pate has is a 32% reduction in his parenting time compared to what he had. There were numerous witnesses, Your Honors, who testified about Keehan coming to the parenting time, running up to Jonathan, hugging him, kissing him, hugging all of the other family members and kissing them. That, with the parenting time that has been put in place in this case, that is reduced by 28 days a year. And that's a lot of days for a three-and-a-half-year-old to be denied that parenting time. Moreover, from January until March, with the schedule that's put into place, there will be no parenting time. That's almost 12 weeks of a three-and-a-half-year-old not seeing his father, not having that intimate relationship with the father. Now, Skyping was mentioned. A three-and-a-half-year-old, I think this Court would recognize, is not going to be good at Skyping, and my client testified to the difficulty with regard to that type of communication. From January to March, there will be no contact. From September to November, there will be no contact. Personal contact, based on the schedule that has been put into place. With regard to the motives of Nicole, I've briefed that. I think there was sufficient evidence, significant evidence, of interference with Mr. Pate's parenting time and with her motives. And as such, I think the Court definitely should have considered, why didn't these people even look for employment in Illinois before they moved three-and-a-half-year-old Keehan thousands of miles away? The hearsay testimony that was allowed by Mr. Hanson, that he was approached by his supervisors at State Farm and asked to take the supervisor, apply for the supervisory job, did Mr. Hanson go further and say, is there a job here in Bloomington? Is there any job in Bloomington? And as I briefed, I think the Court was wrong to not consider the jobs that I attempted to introduce that demonstrated there was a job one month after they moved, after Mr. Hanson moved. There was a job available in Bloomington at an M01 level, which was what Mr. Hanson accepted in Florida. Three months later, there were ten jobs, the same job that Mr. Hanson accepted in Florida, that were available in Bloomington. And I do think that evidence was relevant and demonstrates there was not a need for this move to take place. And considering Mr. Hanson's job opportunities here, the situation that they had when they lived in Bloomington, there was not sufficient evidence in this case, Your Honors, to establish that it was in Keehan's best interest that he be moved thousands of miles away, away from a very close father, away from extensive family members. Counsel, are you appealing any of the trial court's unilateral rulings? Judge, I've argued the evidentiary rulings of them submitting... That wasn't my question. Yes, I am, Your Honor. Did you set that forth as any of the statements of the people? No. The only issue statement is whether the trial court's ruling that removal was in the child's best interest was against an office where there was evidence. That's true, Your Honor. So if you're arguing that the trial court erred by letting an hearsay evidence, or erred by barring certain elements you wanted to raise, don't you have to raise that in this case? Yes, Your Honor. Judge, in addition to the arguments raised in my brief and the arguments I've laid out today, I do believe it was against the manifesto of the evidence that the court concluded moving Keehan to Florida. Let me ask you this question. I'm familiar with this manifesto. What are your questions? The panel you're arguing before, the Board of Districts, I don't know the precise number, but we have, cumulatively, about 45 years of experience as trial judges. Our sympathy, and certainly mine, and I speak for my colleagues, is with the trial judge. And particularly cases like this. You've presented a very strong case on why the request should have been granted to bring this child out of slavery. Not untypically, these cases come up on a panel, are very strong cases both ways. The reason I mention all of this is my hesitance to second-guess the trial judge who heard and saw the witnesses in this contested matter. And my looking back to the time when he was a trial judge, I was in a position to do that, and to recall just how much better the trial judge's opportunity to assess the evidence, the characters, the people, than is mine now as a felon judge from this cold record. To begin with all of this, how can we conclude that based on the evidence before us, that that evidence clearly calls for a conclusive opposite of what the trial court reached, which, as you know, is the standard. That's the threshold we have to fight across before we can reverse it. And, Judge, I believe the reason you have to conclude that is Judge Fitton relied upon evidence that was not in the record. Mr. Hansen was not earning between $80,000 and $100,000. And that was Judge Fitton's comment and his only reasoning as to the financial circumstances. He was earning $43,800, Judge. In what context did Judge Fitton read that statement? In explaining his ruling, Your Honor. Where did that figure come from? I'm sorry, the figure of? Where did the figure the judge used come from? The only comment about an M3 was Mr. Hansen testifying he would like to get to that level at some point. That's where that came from. There was no evidence that he was there or that he would get there. The other reasons, Your Honor, I think you must reverse is I still can't tell, standing here today, whether Nicole's position was compare this to when I lived in Danville or compare this to when I lived in Bloomington. Nor can I tell what, and again, with all due respect to Judge Fitton, nor can I tell what his reasoning was as to that issue. Because at one point he refers to, compares the schools in Danville. And then another point in his ruling, he is comparing the move to Florida to the move from Bloomington. So I don't know what evidence he had with regard to the Danville schools. When making its ruling during the trial, Judge Fitton indicated it would only accept information about the schools only as to how that went to Nicole's state of mind. And then he's comparing the Danville schools to the Florida schools and concluding that the Florida schools look better. So we don't, in this case, Your Honor, know what the evidence was that actually led to this ruling.  And for those reasons, I do ask that the court reverse the trial court's ruling. The final comment Judge Fitton made in his ruling was, unfortunately, we live in a mobile society. And it's not unlikely, it's reality now. And as this court knows, living in a mobile society and the fact that Nicole would have chosen and preferred to live with her husband is not enough to authorize this removal. And I do not believe the evidence supports the authorization of the removal. Thank you, Your Honor. Thank you, Mr. Grant. Ms. Skinner? May it please the court? Counsel? My name is Angela Skinner and I represent the appellee in this case, Nicole Sahovsky. As an initial matter, in response to your question, Justice Steigman, about whether Section 609 of the Marriage and Dissolution of Marriage Act applies to parentage cases, previously this was not the case. But the Parentage Act was amended in 2003, I believe. Could be. Right. Previously, it was not the case by law? Yes. In 2003, I believe, the Parentage Act was amended to incorporate Section 609 of the Marriage and Dissolution of Marriage Act. The 2006 case of Roe v. Martinez, a 4th District case, was a parentage case to discuss the 609 factors. So 609 does apply to parentage cases. So does the Parentage Act have the same section, or does the Parentage Act simply refer to incorporating the section from the All-Out Marriage and Dissolution Act? I believe it says that in removal cases, 609A is incorporated into the Parentage Act. Okay. Mr. Grant suggested that KP, I will refer to the child as KP just to be consistent with the briefs, that he has issues with Skyping. Hansen and Nicole's testimony suggested that he was able to Skype just fine with Hansen when Hansen was living in Florida. So therefore, the trial court, who could wear the credibility of the witnesses, apparently believed that he was able to Skype just fine. So for reasons that I'm not sure I understand, didn't the legislature say that electronic visitation can't be a factor in weighing questions like the one before this court? It could not be a determining factor. But in the intermarriage of Coulter, which was a 2012 case from the 3rd District, the court suggested that electronic communication, while it was not a replacement per se for physical visitation, can be another consideration because that is an additional way that the child can keep in contact with the parents. What does the legislation say on that subject? The legislation says that it cannot be considered straight visitation. So cannot be considered seems to be rather stronger than can be the determining factor, doesn't it? But it can be. It is a form of communication. So it is not as if he will have zero communication, zero contact with his parents. We don't have to file the 3rd District's case, and unless we can come up with an explanation why it cannot be considered means not being a determining factor, I'm not sure why we should. All right. The trial court's plan of removal of the minor child, KP, to the state of Florida. Let me interrupt for a moment. You heard the argument of Mr. Graff, and one point at which he argued with the trial court here was with regard to the dollar figure and salary. Yes. So I'd like, before I forget, to increase the attention span. Certainly. I'd like you to address that point and give us your side of that. Certainly. Mr. Hanson, Nicole's husband, in Bloomington he was earning $12 per hour, so that worked out to around $23,000 per year. In Florida, initially he received $41,000 as his increase in pay, and at the time of trial he had been promoted, so that at the time of trial he was earning around $43,000, which was about a $20,000 increase in pay as compared to Bloomington. Where did the $80,000 figure come from, Mr. Graff? The evidence establishes that the management grade that he is at, I believe it's an M1 position at State Farm, if he continues in that same management position, the top people at that position cap out at around $70,000 to $80,000. There was testimony that things were going quite well in Florida. He had already been promoted once. He believes that he can be promoted to the M3 position, which the top people at that position cap out at around $130,000. So I'm not quite sure where the $80,000 comes from. I believe it was $70,000 and $130,000. Is speculation at this point for the man to be promoted ever? It is certain that he has already been promoted once. Obviously no promotions are ever certain, but he has already been promoted once in a very short period of time, and he testified that things were going quite well for him in his job. There's already been a $20,000 increase. As the court is aware, the appellant has the burden to show that the lower court's decision is against the manifest weight of the evidence. He is unable to show this because removal is in KP's best interest. There are numerous reasons why removal is in KP's best interest, but I'll focus on three main reasons today. First is the improvement in the family's finances in Florida. And to clarify, when I'm talking about the family, I'm referring to Nicole Sahotsky, her husband, John Eric Hansen, and KP, who is almost four years old. Second, KP will have an improved quality of life in Florida because the family will be able to spend more time together as a family unit due to more flexible work schedules. And finally, in addition to the enhancement to KP's life in Florida, the visitation schedule established by the trial court is reasonable and will allow the child to maintain a good relationship with his father. And I'll explore these issues in great detail. First, regarding the financial improvements. Nicole and Hansen began dating before KP's birth in 2011. At the time of his birth, they began residing as a traditional family. At the time of trial in August 2014, they had been married for about a year and a half. As I alluded to a little bit earlier, when the family lived in Bloomington, Hansen made $12 per hour, which worked out to around $23,000 annually. At this time, Nicole was working as a nurse, and she was earning $43,000 annually. The testimony of trial showed that based on their combined incomes in Bloomington, the family was making ends meet financially, but that is all. At this time, in order to make even just to make ends meet, Nicole and Hansen had to work opposing shifts, meaning that their family dynamics suffered as a result of that. There came a time when Hansen was approached by his supervisor to make him aware of a salaried supervisory position in Jacksonville, Florida. As I stated earlier, compared to the $23,000 he was making in Bloomington, he would make $41,000 in that position in Florida, which represented an $18,000 increase in pay. That's correct, but even based on the 6 a.m. to 6.30 p.m. schedule, he's a toddler, he goes to bed at 7 or 8, so in the days she was working, she was only able to see him a couple hours per day, and as I will get to a little bit later on, she's going to be looking for positions that even the hours work even better with his schedule in Florida. In addition to the increase in base pay, he would receive management bonuses in Florida, and his other benefits would increase as well based on the increase in his base salary. Hansen's testimony established there was little opportunity for similar advancement at the Bloomington State Farm, so they realized it would be in his family's financial best interest for him to make the move to Florida. He therefore accepted the position and relocated to Florida in November 2013. At this time, Nicole and KP moved to Danville to live with their parents because they could not afford to maintain two households. At this time, they were able to sell the house in Bloomington Normal, and Nicole filed her petition for removal because she thought it would be in KP's best interest for the family to be reunited in Florida where they could benefit from Hansen's increased salary. While the case was pending, as I mentioned, Hansen was promoted, so at the time of trial he was earning $43,000 per year, $20,000 more than he earned in Bloomington. How long had he been in Florida? I believe it was a couple of months. When he took the job, he was getting an increase in pay. I thought it was worth it. Was it? He knew his starting salary was going to be $41,000. He did not know about the additional promotion that left him at $43,000. I think his testimony was that he was quite surprised that people normally did not get promoted that quickly. So you said, Nicole, that the raise is $2,000 annually. Yes. So you're talking about $150 a month or something. These people aren't wealthy by any means, so even that much of an increase in salary makes a difference on a daily basis. All right. Nicole, while Hansen was working in Florida, was able to find a nursing position in Danville that earned her roughly $47,000 per year. These were the facts regarding the family's finances at the time of trial. At trial, Nicole testified about her work plans in Florida if removal were granted. She stated she would not have to immediately find a job because Hansen could support them full-time. While KP settled in to allow her to search for employment, it was more conducive to the family's schedule. She discussed the types of jobs she would be looking for and that they were worth the same or an increased rate of pay compared to her job in Danville. In her testimony, she did not specifically state whether she would be working full or part-time, but there was Respondent's Exhibit 25, which was admitted to evidence at trial. This was a list of nine positions that Nicole had investigated in Florida and for which she would be qualified. These were all full-time positions. None of them were part-time. She presented as much evidence at trial as was realistically possible. Most employers are reluctant, because of the uncertainty in timing, to extend a job offer to someone in the middle of a pending removal case, knowing it's uncertain how long it will be before a person can move there. Johnson suggests that Nicole's plans were vague, but she was as specific as was realistic for her to be. The evidence establishes that she will be seeking a position that will pay her the same or the increased rate of pay compared to Danville, and that this will be a full-time position that will have a schedule that will fit better with the rest of the family's scheduling. There is certainty regarding the family's finances. Hansen's income has improved substantially, which means Nicole will have the flexibility to seek employment that is more conducive to the family's schedule. The improvement in income here is analogous to the intermarriage of Lewinsky, a 2000 case from the 4th District. Removal there was granted in large part because father's income was going to increase by around $14,000 to $19,000 following removal. The court recognized the importance of the higher income to the family and granted removal, even though the evidence showed that the mother in that case was quite close to the children. There is even more of an increase in income here as compared to the precedent case, so this demonstrates the enhancement to KP's life. Next, regarding the improved family life in Florida. The family's increased income in Florida is undoubtedly a major enhancement to KP's life, but there are other improvements to his life as well. The testimony at trial showed that when Nicole and Hansen worked in Bloomington, Nicole had to work nights because that allowed her to earn the most money to help the family out financially. Specifically, she worked at 10 p.m. until 7 a.m. At this time, Hansen worked 11.45 a.m. until 8 p.m. Because they worked opposing shifts, Hansen and Nicole were only able to spend about an hour per day together, from around 8.30 to 9.30. This caused significant stress on the family because they had to do that to make ends meet, but they were rarely able to spend time together, so their non-financial quality of life suffered. With the move to Florida, Hansen testified he now has a flexible work schedule and can shift his hours around, which will allow him to spend more time with his family. Both Nicole and Hansen testified that she would not have to immediately seek employment, so she would be able to seek employment that has hours that are more flexible and more conducive to the family's schedule. This means the family would be able to spend more time together in Florida, and this would be one stressor that is removed from their household. What about the case that makes the diminution of Jonathan's opportunity to be a parent? As is often the case in a number of cases, there is a decrease in the quantity of days of visitation. I believe it's for V. Martinez, the 2006 case from this district. It stated if removal were only allowed if there was going to be a straight day-for-day, the schedule was going to be the same following removal as before removal. Removal would only be granted if one parent moved right across the border or if they had limited resources to travel out of state to keep the same schedule. So, yes, the number of days will decrease, but it will be in extended blocks of time, which other cases have suggested can improve the quality of the child and parent's relationship because as opposed to just being an every-other-weekend father, there can be more structure to the parenting time, and that will allow KP and Jonathan to maintain their good relationship. Precedent shows that when the family unit's quality of life is improved, that enhances the child's quality of life as well. Again, for V. Martinez, the mother wanted to move to Colorado to live as a household and with her fiancé and the child. The fiancé worked traditional hours, meaning he could spend time with the family, which was important. The mother wouldn't have to live with her parents anymore. She did in Illinois, but could reside as a household with her fiancé and the child. The court emphasized the child's best interests are tied to those of the family because obviously the child is part of the family, so what helps the family helps the child as well. The whole family there would be happier following removal. What about the fact that your client was having the child call her husband dad? So the evidence shows that Nicole testified and Hanson as well, that they had told him that Hanson is a stepdad, Jonathan is your father, to call him John, John Eric, but KP simply didn't get that. He didn't quite get that. He's only three, three and a half. And also Nicole testified that at one point in his life he was calling everyone daddy, so there was no ill will, no bad motive behind that whatsoever. Here in this case, Nicole will no longer have to live with her parents. She will be able to reside as a household, a family with Hanson and KP in Florida. Everyone will be happier and because of the better work schedules, they'll be able to spend more time together as a family. This is another way in which KP's life will be enhanced and why a revolt is in his best interest. Regarding the reasonable visitation schedule, KP's life will be enhanced by the increased finances and the increased family time. He'll be able to have the best of both worlds, a better life in Florida, and because of the reasonable visitation schedule established by the trial court, he'll be able to maintain a good relationship with his father. The trial court orders six weeks of visitation in the summer, one week for Christmas, one week for spring break, four days of Thanksgiving, in addition to liberal visitation in Florida and the additional communication in other ways as well. Visitation on these extended blocks of time will allow Jonathan to have more structure to his parenting time as opposed to the every other weekend visits that he had previously. How is Jonathan going to exercise liberal visitation in Florida? Well, the evidence established that at least once per year the family, the entire family, the extended relatives, at least some of the extended relatives, visited Jonathan's grandfather who lived in Florida. Obviously, since he wants to do what's best for KP, perhaps he'll make additional efforts to visit Florida as well. What did the financial evidence show? I believe he was earning around $30,000 per year. It will perhaps be a sacrifice, but Nicole has repeatedly had to make sacrifices for the child throughout his life. So perhaps it will be a sacrifice. In $30,000 a year, I mean, that's about fairly likely. But was he going to find the money for that liberal visitation to stay in Florida? I don't think that's the reason for this. Well, visitation will, if he does go to Florida, then Mom will obviously make efforts to allow Jonathan to see KP. But what has been established is that there's going to be the six weeks, the one week, one week, and the four days. You mentioned that also liberal visitation instead of Florida. I'm just saying, in my opinion, looking at his income, that's not likely to happen. Well, we will have extended periods of visitation in Illinois. And if he is in Florida, he will have additional visitation then as well. So the precedent cases have discussed the reality, as I mentioned, that January 5 removal, there's fewer days, fewer quantity, but the quality can continue or perhaps even be increased. Again, in Fort V. Martinez, as I discussed, the court stated that removal is allowed, certainly in other cases in which there's a decrease in days. But what is important is that the visitation be reasonable and realistic. It's not about quantity. It is about quality. And also in parentage of RMF, in that 25 case from the second district, the court discussed the idea that the father's relationship with the child would be improved following removal because he would have the chance to spend large blocks of time with the child instead of just every other weekend. The post-removal schedule in that case was quite similar to the one in this case. So KP and Jonathan would be able to maintain a close relationship following removal. Just a word on motives in this case. The improvement in finances and the family's quality of life demonstrate the basis for removal. There's no bad intent or motive on Nicole's behalf. Jonathan's evidence that supposedly shows bad intent is nothing more than a demonstration of how lucky KP is to have two father figures in his life. Hanson has always been there consistently for KP, so he sees him as a father figure. There's no history of denying court-ordered visitation. If anything, Nicole has allowed Jonathan to be more involved in KP's life than was strictly necessary because she knows it is in KP's best interest for him to have a good relationship with Jonathan. Nicole always has been and continues to be motivated by KP's best interests. The trial court is in the best position to assess and evaluate the parties' temperaments, personalities, and capabilities. So the presumption in favor of the result reached by the trial court is always compelling in removal cases. Here, the lower court heard two full days of testimony. The trial court recognized that removal was in KP's best interest for a number of reasons. I focused on three of these reasons, namely the family's substantial increase in income in Florida, the improved family life since all three of them will be able to spend more time together as a family in Florida, and the reasonable visitation schedule that will allow KP to maintain a good relationship with Dad. These reasons, in addition to those stated by the trial court, demonstrate that KP's life was enhanced by removal. Therefore, the lower court's grant of removal was not contrary to the manifest weight of the evidence and the decision below should be affirmed. Thank you for your attention. Thank you, counsel. Mr. Bradford, will you follow? Yes, Your Honor. Your Honor, with regard to Justice Polk, with regard to the question about the daddy comment, I stand by the additional arguments made in our brief and would refer the court to the appendix where Nicole actually herself had placed a, on her Facebook, announcing that she and Daddy, Mr. Hanson, were getting married. The testimony also demonstrated, Judge, that the child had no difficulty not referring to Daddy with any of my client's family members. He knew exactly who was who. With regard to the Ford v. Martinez case, that case is clearly distinct. The evidence was strong in that case that the financial circumstances would be improved. The father in that case was nowhere near as involved as was Mr. Pate in this case. I do note this court in intermarriage of Davis indicated that removal was insufficient, and I think those facts are similar to those here. There was no family in the state in which the mother wanted to move the young child. The father's parenting time would be reduced significantly as it was in this case. Judge, with regard to the parenting time, I also note not only is it restricted by 32 percent, but his summer parenting time is limited to only two-week increments. So that means additional costs, additional stress for Keehan in limiting his three trips for summer parenting time alone. Let's talk about the stress this puts Keehan under. Nicole presented evidence that this would be good for her because she could live with her husband. But let's think about this 3-1⁄2-year-old and the stress he is under when he doesn't get to see his father four days out of 14 any longer, when he has to do all this traveling back and forth, when he has no reasonable contact, again, hugs and kisses from his father on a regular basis and not two, three-month increments where he's not going to have any physical contact with his father or the additional family members who I have mentioned earlier. The stress for Keehan is significant enough to also reverse the trial court's ruling. When we look at all the evidence, I do not believe the evidence demonstrates Nicole met her burden to establish it was in this young child's best interest to remove him from everyone he had regular contact with, everyone he loved, everyone who educated him and socialized him. And again, I ask that the court reverse the trial court's ruling. Thank you. Counsel will take the matter under advisement and be in recess.